

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

APPLIED CONTRACTING CORP.

    Plaintiff/Counter Defendant

    v.

OHIO DEPARTMENT OF TRANSPORTATION, et al.

    Defendants/Counter Plaintiffs

    and

STATE OF OHIO

    Defendant
Case No. 2008-07195

Judge Joseph T. Clark

DECISION

{¶1} Plaintiff/counter defendant, Applied Contracting Corp. (Applied), brought this action alleging breach of contract and unjust enrichment. Defendants/counter plaintiffs, Ohio Department of Transportation (ODOT) and Ohio Department of Administrative Services (DAS), asserted counterclaims for breach of contract and for liquidated damages. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶2} In July 2006, DAS and Applied entered into a contract under which Applied would serve as the lead contractor for the "District 8 Wash Bay Additions" project, which involved making additions to existing structures at two ODOT facilities. (Plaintiff's Exhibit A1.) Specifically, a vehicle wash bay was to be built at ODOT's Wilmington

Outpost, and both a wash bay and a service bay were to be built at ODOT's Blue Ash Outpost.

**{¶3}** While Applied was the lead contractor for the project, DAS also contracted with Airstream Mechanical, LLC (Airstream) for the installation of mechanical, electrical, and plumbing components. Additionally, DAS contracted with Alan Scherr Associates, LLC (ASA) to serve as the associate for the project, in which capacity it provided professional design services and contract administration.

**{¶4}** On July 20, 2006, DAS issued a "Notice to Proceed" to Applied, directing it to commence work "within one week from the date of this notice, and to complete the work by January 3, 2007." (Plaintiff's Exhibit A3.) Over the course of the project, however, there arose various issues which resulted in the parties agreeing through change orders to extend the contract completion date three times, with the final such date being March 3, 2007. (Defendants' Exhibit 9.)

**{¶5}** Donald Legg, President of Applied, testified that although Applied substantially completed its work by the March 3, 2007 deadline, ASA deferred the completion date for certain items such as landscaping, execution of punch lists, and remedial work which ASA and defendants requested concerning the floor of the wash bay at the Wilmington Outpost. Legg testified that Applied timely completed all of the deferred work except for a portion of the remedial work which Applied refused to perform because he felt that it was unnecessary; this work included smoothing the concrete floor of the wash bay and then applying an epoxy coating over the floor.

**{¶6}** The relationship between the parties unraveled as a result of the dispute over the remedial work at the Wilmington Outpost. According to Ryan Meeds, who was the project manager for ASA, Applied completed all of its other work by the beginning of May 2007 and withdrew from the project, in spite of multiple requests from ASA and defendants to complete the few remaining remedial tasks. Legg stated that when ASA sent him a proposed certificate of contract completion, which noted that remedial work remained at the Wilmington Outpost, he refused to sign. (Plaintiff's Exhibit U.)

**{¶7}** On June 5, 2007, Applied sent ASA a two-page letter titled "Final Notice of Claim and Request for Contract extension to September 1, 2007." (Plaintiff's Exhibit V.) Therein, Applied listed twelve issues that had allegedly delayed the project by a total of 241 days, "as a result of the owner failing to adequately provide management,

administration and redesign solutions through the course of the project * * *"; Applied requested additional compensation at a rate of $317.69 per day of delay, for a total of $76,563.29. On June 21, 2007, Applied also sent ODOT several one-page invoices which again requested $76,563.29 for delays, and included various other requests totaling $32,520.70.

{¶8} Applied's June 5 and June 21, 2007 requests for payment were declined by defendants. Further, John Burnie, an ODOT facilities manager who supervised construction at both project sites, testified that defendants terminated Applied's contract and hired another contractor, ISPN, to perform the remaining work at the Wilmington Outpost.

{¶9} On June 16, 2008, Applied filed the instant complaint, asserting that defendants committed a breach of contract both by causing project delays and by wrongfully withholding payments owed under the contract; that defendants were unjustly enriched; and that defendants committed a breach of its contract with Airstream, to which Applied was a third-party beneficiary.

**DELAYS**

{¶10} In Count One of its complaint, Applied alleges that defendants committed a breach of contract by causing twelve separate project delays totaling 241 days, as set forth in the June 5, 2007 "notice of claims" that Applied submitted to ASA. The court shall address the alleged delays individually.

{¶11} **"Utility pole relocation necessitated by failure to properly design the project. 30 days."**

{¶12} On July 20, 2006, Legg sent a request for information to ASA in which he noted that a utility pole at the Wilmington Outpost needed to be relocated in order to begin excavation. (Plaintiff's Exhibit F.) Burnie and Meeds stated that ASA arranged for the owner of the pole, Dayton Power & Light, to relocate the pole outside the project site, and that the site was ready for work on August 18, 2006. According to Legg, this issue delayed Applied from working at the Wilmington Outpost from July 26, 2006, to August 18, 2006.

{¶13}    On December 15, 2006, the parties signed Change Order No. G-02, which states, in part:  "This Change Order is to provide the contractor a no cost, time exten[s]ion to the project completion date due to previous weather related conditions and *unforseen utility relocation requirements.*  During this time exten[s]ion there will be no cost penalties assessed to the contractor for lack of project completion.  If however the projects are not completed by this new [February 18, 2007] completion date penalties will be assessed per the original bid documents."  (Defendants' Exhibit 6.)  (Emphasis added.)  All change orders executed during the project also stated:  "This Change Order identifies and provides full and complete satisfaction for all direct and indirect costs, including interest and all related extensions to the time for Contract Completion, for the described changes in the Scope of the Work."

{¶14}    Burnie testified that he believed the change order resolved all issues concerning the utility pole relocation.  Legg also admitted that the parties intended for the change order to resolve the utility pole relocation, and he acknowledged that all change orders signed by the parties were negotiated.  Legg stated, though, that he later decided that the change order failed to adequately redress the issue and that he therefore requested additional compensation in the June 5, 2007 notice of claim.

{¶15}    Article GC 7 of the contract provides, in part:

{¶16}    "7.1.1  The Department, without invalidating the Contract, may order changes in

{¶17}    the Work consisting of additions, deletions or other revisions, including without limitation revisions resulting from an extension granted in accordance with Paragraph GC 6.4.  To the extent the time for Contract Completion or the Contract Price is affected, the Contract may be equitably adjusted by Change Order in accordance with this Article and the Change Order Procedure and Pricing Guidelines (CO). * * *

{¶18}    "7.1.1.4  The Contractor understands and agrees that agreement to a Change Order is final and without reservation of any rights."

{¶19}    "Where the parties to a construction contract agree to a change order which they intend to provide complete compensation for a given change in the project, the party being compensated by the change order will be contractually foreclosed from seeking additional compensation related to that same project change."  *Rabin v. Anthony Allega Cement Contractor, Inc.*, Franklin App. Nos. 00AP-1200 & 00AP-1241,

2001-Ohio-4057. Furthermore, change orders constitute part of the contract between the parties. *High Voltage Systems Div., The L.E. Myers Co. v. Ohio Dept. of Transp.* (Dec. 19, 1978), Franklin App. No. 78AP-88.

{¶20} The evidence demonstrates that the parties intended for Change Order No. G-02 to be a final and complete resolution of the issues relating to the utility pole relocation. As such, the court finds that the terms of Article GC 7 and Change Order No. G-02 bar Applied from seeking additional compensation in relation to the utility pole relocation.

**{¶21} 2. "Downspout relocation necessitated by existing concealed conditions which was belabored by the design group to an appropriate resolution. 37 days."**

{¶22} Legg testified that when Applied began to excavate at the Wilmington Outpost, a significant amount of groundwater was discovered. According to Legg, Applied attempted to pump the water out of the excavated foundation trenches, but the ground remained too saturated to build the foundation according to the project specifications. Legg stated that this problem resulted from naturally occurring groundwater, a downspout on the existing structure which emptied rainwater onto the project site, and water accumulating in a pit within the project site where an underground storage tank was once located. According to Legg, groundwater issues delayed Applied from working at the Wilmington Outpost from August 29, 2006, to October 4, 2006.

{¶23} On October 27, 2006, the parties signed Change Order No. 1, which stated that "[g]roundwater was encountered during initial excavation at Wilmington site" and that, as a result, Applied was to install perforated drainage tile at the site which would empty into an existing catch basin. (Defendants' Exhibit 7.) Change Order No. 1 provided that Applied would receive $650 in additional compensation and that the contract completion date would be extended from January 3, 2007, to January 12, 2007.

{¶24} Additionally, on December 28, 2006, the parties signed Change Order No. 5, which stated that, "due to water infiltration problems," Applied was to excavate an additional six inches in the foundation trench and then pour a concrete "mud pad" in the trench so as to provide a stable surface on which to lay the footer. (Defendants' Exhibit

8.) Change Order No. 5 provided that Applied would receive additional compensation in the amount of $2,413.61.

{¶25}   Legg, Burnie, and Meeds testified that Change Orders Nos. 1 and 5 were intended to address all groundwater issues, including the downspout which emptied water onto the project site.  Legg testified that despite signing the change orders on behalf of Applied, he felt that they did not adequately compensate Applied, particularly to the extent that they failed to include compensation for overhead and profit.

{¶26}   Upon review of the evidence, the court finds that the parties intended for Change Orders Nos. 1 and 5 to provide complete and final resolution of all groundwater issues.  Although Legg testified that he did not agree with these change orders, he nonetheless signed them on behalf of Applied.  As previously stated, Subparagraph GC 7.1.1.4 of the contract provides that agreement to a change order is "final and without reservation of any rights."  Accordingly, the terms of Article GC 7 and Change Orders Nos. 1 and 5 bar Applied from seeking additional compensation in relation to the groundwater issues.


{¶27}   **3.  "The existing out of level building concealed condition that when brought to the attention of the design group failed to give appropriate direction and redesign as requested by Applied Contracting Corp.  80 days."**

{¶28}   When Applied prepared to lay the footer and foundation for the addition to the Blue Ash Outpost, it discovered that the footer on the existing structure was approximately three inches out of level.  There is no question that this issue was previously unknown to all parties and that it was thus not addressed in the project plans. Legg and Burnie testified that when Applied requested instructions from ASA on how to proceed in light of this discovery, ASA directed Applied to proceed with the block foundation as planned, but to match the profile of the existing structure, even though this would result in the addition also being out of level.

{¶29}   Applied built the foundation according to ASA's directive.  Afterward, Applied grouted the foundation blocks with cement and used vertical rods as reinforcement; however, while this was the method of construction shown in the project drawings, the project specifications stated that an additional wire-mesh reinforcement

product known as Durawall was to be installed within the mortared joints of the block foundation. Legg acknowledged that Applied must have failed to review the project specifications.

{¶30}    On September 20, 2006, ASA issued a field work order directing Applied to remove the block foundation "for non-conformance with the contract documents" and to replace it with a poured concrete foundation. Burnie and Meeds stated that the order to replace the block wall with a poured concrete wall resulted from Applied's failure to install Durawall and Applied's failure to keep the footer dry during construction, which could weaken the foundation. In contrast, Legg testified that he believed defendants raised the Durawall issue in order to provide a convenient reason for retracting ASA's original directive to build the addition out of level.

{¶31}    On December 15, 2006, the parties executed Change Order No. 4, which states, in part: "The existing CMU foundation was required by the associate to be removed due to multiple work and site related conditions. The conclusion by all parties was that a poured concrete foundation wall was the best alternative to achieve a level foundation elevation to begin CMU block walls." (Defendants' Exhibit 3; Plaintiff's Exhibit J.) Change Order No. 4 provided that Applied would receive additional compensation in the amount of $8,897. In conjunction with Change Order No. G-02, which pertained to the utility pole issue and was executed on the same day, the contract completion date was extended from January 12, 2007, until February 18, 2007.

{¶32}    Burnie testified that the parties intended for Change Order No. 4 to resolve all issues associated with the foundation problems. Legg testified that he believed Change Order No. 4 pertained to certain costs associated with the foundation problems, but that the matter of delays which Applied consequently incurred was a separate issue which the change order did not redress.

{¶33}    The weight of the evidence establishes that the parties intended for Change Order No. 4 to provide complete and final resolution of the issues pertaining to the construction of the foundation at the Blue Ash Outpost. Accordingly, the terms of Article GC 7 and Change Order No. 4 bar Applied from seeking additional compensation in relation to the foundation issue.

**{¶34}** 5. "Lateral design delay which the design group failed to properly design according to the existing conditions. 13 days."

**{¶35}** 8. "Catch basin addition on the new lateral line which the design group failed to design for the storm sewer conflict even after warned of the conflict by their own representative and Applied Contracting Corp. 2 days."

**{¶36}** Paragraphs five and eight of Applied's June 5, 2007 notice of claim are similar in nature and shall be addressed together. The design plan for the Wilmington Outpost contemplated that wastewater inside the new wash bay would drain along the sloping cement floor of the bay, into a trench drain located in the middle of the floor, through an oil separator, and then through a buried lateral pipe which would connect with an existing sanitary sewer. This design plan contemplated that water would naturally flow through the buried lateral pipe by force of gravity, dropping in elevation from the oil separator to the sanitary sewer. However, the parties discovered during construction that there was not a sufficient drop in elevation from the oil separator to the sanitary sewer to allow the water to naturally flow in this manner. Legg stated that the parties also discovered around this time that an existing storm sewer intersected the path in which the lateral pipe was to be installed.

**{¶37}** Legg testified that on November 30, 2006, he sent ASA a request for information pertaining to both the elevation and storm sewer issues. Legg stated that Applied was delayed for 13 days while it awaited a response from ASA.

**{¶38}** The solution that ASA ultimately developed for the elevation issue involved routing a section of lateral pipe from the oil separator into a sump pit, and then installing a pump in the pit to propel water through another section of lateral pipe and into the sanitary sewer. As to the issue of the storm sewer that intersected the proposed path of the lateral pipe, Legg and Burnie stated that defendants decided to address this problem by rerouting the lateral pipe through a catch basin which ODOT employees would build on their own. Legg stated that Applied was delayed for two days while it waited for ODOT to build the catch basin.

**{¶39}** On March 16, 2007, the parties executed Change Order No. 21, which states, in part: "This Change Order is to provide the contractor with additional funds to pay for the requirement for additional depth of excavation and fill from the existing building to the newly required sump pit area. The discovery was made that the actual

height of the invert [at] the lateral connection from the new expansion trench drain was 2'-0" +/- lower than was depicted on earlier as-built drawings. The sump pit/pump was required to be installed to get the water from the building to the newly discovered invert elevation." (Defendants' Exhibit 10.) The change order provided that Applied would receive additional compensation in the amount of $4,191.83, and an extension of the contract completion date from February 18, 2007, until March 3, 2007.

{¶40} Legg testified that although Applied received additional compensation and a 13-day extension of time, he does not believe that Change Order No. 21 adequately redressed the delay in ASA's responding to his request for information.

{¶41} However, the court finds that the parties intended for Change Order No. 21 to provide complete and final resolution of the issues pertaining to the differing site conditions that required redesigning, and delayed construction of, the lateral pipe at the Wilmington Outpost. Accordingly, the terms of Article GC 7 and Change Order No. 21 bar Applied from seeking additional compensation in relation to such issues.

{¶42} **4. "Delay of sump installation which the design group failed to properly design according to the existing conditions and then failed to direct the other prime contractor into a timely installation after the redesign. 24 days."**

{¶43} **6. "Mechanical prime contractor delays in maintaining project scheduling, providing temporary heat and perform his cutting and patching as required by contract. The group failed to direct this prime contractor to maintain his contractual obligations after repeated request[s] to do by Applied Contracting Corp. 15 days."**

{¶44} **11. "Trench drain removal and replacement which the design group attempted to force Applied Contracting Corp. to incur the cost of. While alleviating the other prime responsibility for the cost, alleging failure to inspect, while in fact it was a latent defect by the other prime to properly install his work which floated during the pour. 24 days."**

{¶45} **12. "Delay of asphalt repairs which was brought on by the group[']s failure to coordinate with the other prime a deal that Applied Contracting Corp. was not party to and ODOT's failure to execute [its] own self performed work. 10 days."**

{¶46}    Paragraphs four, six, eleven, and twelve of Applied's June 5, 2007 notice of claim are similar in nature and shall be addressed together.  Applied contends that it suffered damages as a result of Airstream allegedly delaying its performance in several aspects of the project.  Applied further argues that such damages are attributable to defendants to the extent that defendants and ASA did not enforce the project schedule.  Legg stated that he informed ASA several times about Airstream's alleged delays and requested that Airstream be removed from the project.

{¶47}    Article GC 4 states, in part:

{¶48}    "4.1.2  The Contractor shall perform the Work so as not to interfere, disturb, hinder or delay the Work of other Contractors.  The sole remedy which may be provided by the Department for any injury, damage or expense resulting from interference, hindrance, disruption or delay caused by or between Contractors or their agents and employees shall be an extension of time in which to complete the Work.  This provision is intended to be, and shall be construed as, consistent with, and not in conflict with Section 4113.62, ORC.

{¶49}    "4.1.2.1  If the Contractor, or any of the Contractor's Subcontractors or Material Suppliers, causes damage or injury to the property or Work of any other Contractor, or by failure to perform the Work with due diligence, delays, interferes with, hinders or disrupts any other Contractor, who suffers damage, injury or expense, the Contractor shall be responsible to the other Contractor for such damage, injury or expense.

{¶50}    "4.1.2.2  The intent of Subparagraph GC 4.1.2.1 is to benefit the other Contractors on the Project and to demonstrate that each other Contractor who performs Work on the Project is third party beneficiary of the Contract."

{¶51}    To the extent that Applied claims that it suffered damages as a result of Airstream's delays, Article GC 4 provides that Applied shall seek its remedy from Airstream.  Pursuant to Paragraph GC 4.1.2, the sole remedy which defendants could provide to Applied for Airstream's delays was an extension of time.

{¶52}    Although Applied argues that Airstream's delays are attributable to defendants in that defendants and ASA failed to enforce the project schedule or otherwise committed a breach of their contracts with either Applied or Airstream, the greater weight of the evidence shows that defendants and ASA worked to facilitate

timely completion of the project in adherence to the contract. Defendants and ASA were responsive to Applied's concerns and extended the project completion date as needed. Indeed, the evidence shows that the project was on pace to be timely completed until Applied withdrew from the project.

{¶53} Further, Paragraph GC 4.1.4 of the contract provides that coordination among contractors was the responsibility of Applied. Upon review, the court is not persuaded that Applied sufficiently coordinated its work with Airstream as required by the contract.

{¶54} Accordingly, the court finds that Applied has failed to prove its claims that defendant committed a breach of contract, either through third-party beneficiary or standard breach of contract theories.

{¶55} **7. "Interior painting change delay which the group failed to design the protective coating that was applicable with its final design intent. 3 days."**

{¶56} Legg testified that Applied was delayed by three days as a result of defendants' decision to utilize a polyurethane paint for the wash bays rather than the latex paint specified in the plans.

{¶57} On January 26, 2007, the parties executed Change Order No. 9, which stated, in part: "Paint the Wilmington and Blue Ash WASH BAY interiors with one coat of polyurethane and coat of epoxy paint in lieu of the specified (2) coats of latex paint as discussed. The Blue Ash site has two bays, only one of which is a wash bay - the other is a garage bay to remain as latex paint. This epoxy and polyurethane paint coating is to be applied over the block filler as specified in the base bid contract documents and per manufacturer recommendations. It was noted by ODOT that the latex paint currently specified has been found on other projects to not hold up to the wash bay conditions and a more durable paint is required for longevity." (Defendants' Exhibit 17.) Pursuant to Change Order No. 9, Applied received additional compensation in the amount of $3,857. Upon review, the court finds that the parties intended for Change Order No. 9 to provide complete and final resolution of the issues pertaining to the interior paint selection. Accordingly, the terms of Article GC 7 and Change Order No. 9 bar Applied from seeking additional compensation in relation to this issue.

**{¶58}** **9.  "Apron modifications * * * inappropriately design[ed] with out reinforcement.  2 days."**

**{¶59}** Legg testified that Applied was delayed for two days while defendants redesigned the concrete apron at the entryway to the wash bay at the Wilmington Outpost.  According to Legg, defendants redesigned the apron in order to include a reinforcement product over which the concrete would then be poured.

**{¶60}** On March 16, 2007, the parties executed Change Order No. 22, which stated, in part:  "This Change Order is to provide the contractor with additional funds to pay for the requirement for fibermesh to be installed in the concrete for the aprons at both locations and also increase the depth of the apron at the joint to the asphalt pavement."  (Defendants' Exhibit 18.)  The change order provided that Applied would receive additional compensation in the amount of $962.46.

**{¶61}** The weight of the evidence establishes that the parties intended for Change Order No. 22 to provide complete and final resolution of the issues pertaining to the redesign of the concrete apron.  Accordingly, the terms of Article GC 7 and Change Order No. 22 bar Applied from seeking additional compensation in relation to this issue.


**{¶62}** **10.  "Additional time required to install sump location bollards.  1 day."**

**{¶63}** Legg stated that Applied was delayed one day as a result of defendants'

**{¶64}** decision to have Applied install protective bollards around the sump pit at the Wilmington Outpost so as to prevent vehicles from driving over the pit.

**{¶65}** On March 16 and 17, 2007, the parties executed Change Order No. 20, which states, in part:  "This Change Order is to provide the contractor with additional funds to pay for the requirement for new painted steel bollards around the newly required sump pit area.  The discovery was made that the actual height of the invert [at] the lateral connection from the new expansion trench drain was 2'-0" +/- lower than was depicted on earlier as-built drawings.  The sump pit/pump was required to be installed to get the water from the building to the newly discovered invert elevation."  (Defendants' Exhibit 9.)  The change order provided that Applied would receive additional

compensation in the amount of $753.57, and the contract completion date was extended from February 18, 2007, until March 3, 2007.

{¶66} The weight of the evidence establishes that the parties intended for Change Order No. 20 to provide complete and final resolution of the issues pertaining to the installation of the steel bollards. Accordingly, the terms of Article GC 7 and Change Order No. 20 bar Applied from seeking additional compensation in relation to this issue.

**INVOICES**

{¶67} Applied alleges that defendants committed a breach of contract by failing to remit payment on the four invoices, dated June 21, 2007, which were submitted to ODOT and collectively requested payments totaling $109,083.99. (Plaintiff's Exhibit W.) These one-page documents, which set forth only minimal details and are not accompanied by supporting documentation, requested payment on various grounds.

{¶68} In one invoice, Applied sought $76,563.29 in "damages for delay due to owners inactions." However, this is the same amount requested due to the alleged delays cited in Applied's June 5, 2007 notice, which the court has determined to be without merit.

{¶69} Also included in the invoices is a request for $379.48 in additional compensation for work associated with the "out of level building at [the] Blue Ash Outpost." However, as previously stated, Applied agreed to resolve that issue through Change Order No. 4 and is thus contractually barred from seeking additional compensation for the same.

{¶70} One of the invoices requests additional compensation in the amount of $7,590.01 for replacing the original trench drain which Airstream installed at the Wilmington Outpost; removing dirt from the sump and oil separator at the Wilmington Outpost, which "Airstream failed to remove"; and repairing wall surfaces which Airstream damaged at the Wilmington Outpost. As previously stated, though, the contract unambiguously states that Applied must pursue from Airstream a remedy for damages caused by Airstream. And, as the court has previously found, to the extent that Applied attributes damages allegedly caused by Airstream to defendants, such claim is without merit.

**{¶71}** Applied also requested additional compensation in the amount of $2,296.90 for additional bond costs that it incurred as a result of increases in the contract price. Subparagraph GC 7.1.1.1 states: "The Contractor shall proportionately increase the amount of the Bond whenever the Contract Price is increased." However, inasmuch as increases in the contract price occurred through the execution of change orders, the change orders afforded "full and complete satisfaction for all direct and indirect costs" associated with the project changes described therein. The court finds that Applied's agreement to change orders which caused the contract price to increase contractually barred Applied from later seeking additional compensation.

**{¶72}** In another invoice, Applied requests an interest payment of $129.66 for an alleged 10-day delay in the payment of Applied's Draw Request No. 4. Upon review, the court finds that Applied failed to produce sufficient evidence, such as the relevant dates, in order to prevail upon this claim.

**{¶73}** Finally, the invoices include a request for payment in the amount of $932.25 pursuant to Change Order No. 26 (Plaintiff's Exhibit T), and a request for payment in the amount of $21,192.40, representing Applied's contractual Payment Request No. 7. Legg testified that these invoices comprise Applied's request for final payment, representing the balance of Applied's contractually-approved compensation. Burnie testified, however, that these invoices did not comply with the contractor payment process set forth in Article GC 9 inasmuch as Applied failed to provide any documentation to substantiate its right to final payment.

**{¶74}** Article 9 states, in part:

**{¶75}** "9.2.1 The Contractor shall submit monthly to the Associate an itemized Contractor Payment Request for Work performed based upon the Schedule of Values. * * *

**{¶76}** "9.2.1.1 The Contractor Payment Request shall be supported by documentation substantiating the Contractor's right to payment. The Contractor shall supply such additional documentation as the Associate may request in connection with each payment to the Contractor.

**{¶77}** "9.2.1.2 Contractor payroll reports for the period of time indicated shall be attached to one (1) copy of every Contractor Payment Request * * *

**{¶78}** "9.2.1.3  The Contractor shall list on the Contractor Payment Request any approved Change Orders processed and performed during the time covered by the Contractor Payment Request.

**{¶79}** "* * *

**{¶80}** "9.7.1  The Contractor, as a condition precedent to * * * final payment, shall provide all documents pursuant to Subparagraph GC 11.1.1 for approval by the Associate.

**{¶81}** "9.7.1.1  The Contractor shall execute an affidavit to certify that the Contractor has complied with all requirements of Section 4115, ORC.

**{¶82}** "9.7.1.2  The Contractor shall execute an affidavit to certify that all Subcontractors and Material Suppliers have been paid in full for all Work performed or materials furnished for the Project."

**{¶83}** Further, Paragraph GC 11.1.1 states that "[t]he Contractor, as a condition precedent to * * * final payment, shall provide all Project record documents to the Associate for approval, which may include, without limitation" various documents such as payroll reports, inspection certificates, as-built drawings, and an affidavit to certify that all subcontractors and material suppliers have been paid in full.

**{¶84}** The court finds that Applied failed to prove that it complied with the process for requesting final payment under the contract.  The one-page, cursory invoice that Applied offered as evidence of its request for final payment lacks any substantiating documentation and thus fails to satisfy the requirements of Articles GC 9 and 11 relating to a request for final payment.  Moreover, the invoice reflects that it was submitted to an ODOT district office rather than to ASA, as required by Articles GC 9 and 11.

**{¶85}** Accordingly, the court finds that Applied failed to prove that defendants committed a breach of contract by declining to remit payment in response to Applied's invoices.

**UNJUST ENRICHMENT**

**{¶86}** With respect to Applied's claim for unjust enrichment, the Tenth District Court of Appeals has held that "the doctrine of unjust enrichment does not apply when a contract actually exists; it is an equitable remedy applicable only when the court finds there is no contract." *Alternatives Unlimited-Special, Inc. v. Ohio Dept. of Edn.*, Franklin

App. No. 08AP-396, 2008-Ohio-6427, ¶23; see also *Struna v. Ohio Lottery Comm.*, Franklin App. No. 03AP-787, 2004-Ohio-5576, ¶22, quoting *Turner v. Langenbrunner,* Warren App. No. CA2003-10-099, 2004-Ohio-2814, ¶38 ("'Unjust enrichment is an equitable doctrine to justify a quasi-contractual remedy that operates in the absence of an express contract or a contract implied in fact to prevent a party from retaining money or benefits that in justice and equity belong to another.'") In the instant case, the subject matter of Applied's unjust enrichment claim is governed by the terms of the parties' contract. Consequently, the doctrine of unjust enrichment has no application.

{¶87} Based on the foregoing, the court finds that Applied failed to prove any of its claims by a preponderance of the evidence.

## DAS AND ODOT'S COUNTERCLAIMS

{¶88} DAS and ODOT claim that Applied committed a breach of contract in that (1) Applied failed to properly apply interior and exterior paint at the Wilmington Outpost; (2) Applied failed to properly construct a parapet wall at the Wilmington Outpost; (3) Applied failed to properly install pipe at the Wilmington Outpost; and (4) Applied failed to complete its work in a timely manner, thereby entitling DAS and ODOT to liquidated damages under the contract.

## INTERIOR AND EXTERIOR PAINTING

{¶89} DAS and ODOT allege that the application of interior and exterior paint at the Wilmington Outpost was "grossly inadequate and not performed in a workmanlike manner." Legg acknowledged that some peeling and blistering occurred in a few spots, which he attributed to moisture in the block walls that prevented the paint from properly adhering. Legg stated that he believes any such moisture resulted from groundwater being absorbed into the foundation and "wicking" upward through the block wall.

{¶90} Anthony Caludis, who is the superintendent of Flannery Painting, Inc., stated that the Sherwin-Williams paints which were used on the walls were high quality products that met the project specifications. Caludis testified that when he was informed in mid-2007 of a complaint pertaining to peeling paint, he visited and investigated the site. Caludis related that he saw some areas of blistered paint on the

exterior walls, which he attributed to the block being moist while the paint was applied. As for the interior, Caludis stated that he saw blistered paint in one area of the ceiling.

{¶91} Tim Bleh is an employee of Sherwin-Williams who advises customers in selecting appropriate paints. Bleh testified that he accompanied Caludis to the site in mid-2007 in response to the complaint that Caludis received. Bleh related that he saw a few small blisters in the exterior paint, but he opined that the paint had not failed overall and that it is common in a project of that scale to find a few areas of paint in need of retouching. Bleh stated that inside the wash bay, he saw one area of blistered paint on the ceiling underneath the parapet wall. Bleh tested the moisture content of the exterior walls and determined that they were moist, probably as a result of groundwater "wicking its way up" through the blocks.

{¶92} Burnie testified that the exterior paint blistered soon after its application, but that the interior paint did not blister. Burnie stated that he believes the blistering did not result from moisture in the walls inasmuch as it occurred on only one side of the wall.

{¶93} Upon review, the court finds that DAS and ODOT failed to prove that the peeling and blistering of paint occurred as a result of a failure by Applied or its subcontractor to properly apply the paint in a manner consistent with the project specifications. Accordingly, the court shall enter judgment in favor of plaintiff as to this portion of the counterclaim.


**PARAPET WALL**

{¶94} The wash bay addition at the Wilmington Outpost was designed to be about four feet taller than the existing structure to which it would be attached. In order to achieve a uniform appearance between the wash bay and the existing structure, the project design included a four-foot high parapet wall to be built atop the outer walls of the existing structure.

{¶95} DAS and ODOT allege that Applied built the parapet wall in a defective and unworkmanlike manner, and that, as a result, it cracked and is now damaging the original structure. Burnie stated that multiple cracks exist in the parapet wall and that the roof over the original portion of the structure leaks along the wall. Meeds stated that he visited the Wilmington Outpost on September 15, 2009, and determined that a "weep

joint" on a parapet cap had been painted over and was thereby trapping moisture inside the masonry wall.

{¶96} Legg testified that Applied's subcontractor, Greg Jones Masonry, built the parapet wall according to the project specifications. Legg stated that any cracks which subsequently developed are attributable to design flaws, including a lack of vertical wall reinforcement in the existing wall upon which the parapet wall was built; a membrane between the existing wall and the parapet wall which did not allow for a sufficient bond at the bed joint between the walls; unstable ground due to excessive groundwater; and the existing wall is heated by the interior of the building whereas the parapet wall is not heated, thus resulting in different expansion and contraction rates between the two sections of the wall.

{¶97} Kevin Kramer is a project manager for William Kramer & Son, Inc., the subcontractor that Applied hired to perform the roofing work at the Wilmington Outpost. Kramer stated that he was contacted about one year after the roofing work was complete and apprised of a complaint about a leak in the roof of the original structure near the parapet wall. Kramer stated that he consequently visited the site and investigated, but found that the roofing membrane was watertight and that there was no evidence to substantiate a leak.

{¶98} The court finds that DAS and ODOT failed to prove that any defect in the parapet wall occurred as a result of a failure by Applied or its subcontractor to properly construct the wall in a manner consistent with the project specifications. Accordingly, judgment shall be entered in favor of plaintiff as to this portion of the counterclaim.

**LATERAL PIPE**

{¶99} DAS and ODOT allege that Applied failed to properly install the lateral pipe which runs into and out of the sump pit at the Wilmington Outpost, and that, as a result, the pipe leaks in or around the sump pit.

{¶100} Pursuant to Change Order No. 21, Applied installed the pipe to and from the sump pit. (Plaintiff's Exhibit BB.) Legg testified that after Applied installed the pipe, Airstream installed the sump pump and connected it to the pipe. Thus, according to Legg, any leak at the connections between the pipe and the sump pump is attributable to Airstream.

{¶101}     Burnie acknowledged that Airstream was responsible for installing the sump pump, and that Change Order No. 21 required Applied to only install the pipe, not connect the pipe to the sump pump.  Further, Burnie admitted that the responsibilities of Applied and Airstream regarding the sump pump installation were not entirely clear to him.

{¶102}     Upon review, the court finds that DAS and ODOT failed to prove that Applied was responsible for any leak in the connections between the sump pump and the lateral pipe, and judgment shall be entered in plaintiff's favor as to this portion of the counterclaim.

## LIQUIDATED DAMAGES

{¶103}     DAS and ODOT assert that they are entitled to liquidated damages as a result of Applied's failure to complete the project in a timely manner.

{¶104}     Paragraph K-2 3.3 of the contract states, in part: "Failure to complete all Work within the period of time specified, or failure to have the applicable portion of the Work completed upon any milestone completion date, shall entitle the Department to retain or recover from the Contractor, as Liquidated Damages, and not as a penalty, the applicable amount set forth in the following table for each and every calendar day thereafter until Contract Completion or the date of completion of the applicable portion of the Work, unless the Contractor timely requests and the Department grants an extension of time in accordance with the Contract Documents."  (Plaintiff's Exhibit A1.) The table at paragraph K-2 3.3 of the contract provides that the daily rate of liquidated damages shall be $500.

{¶105}     The adjusted contract completion date for the project was March 3, 2007, but, in accordance with the contract, ASA deferred completion of remedial work and other items until May 1, 2007.  (Plaintiff's Exhibit U.)  Legg testified that Applied substantially completed its work by the contract completion date and also timely performed the deferred work, notwithstanding certain remedial work on the wash bay floor of the Wilmington Outpost which Applied refused to perform.  Meeds agreed that Applied ceased work by about the beginning of May 2007, without carrying out the remedial work requested for the wash bay floor.

{¶106} Burnie testified that as a result of both Applied and its bonding company refusing to perform any further work, defendants terminated Applied's contract and hired another contractor, ISPN, to finish the remaining work. The evidence demonstrates that ISPN performed this work in late September 2007, approximately five months after Applied ceased work on the project. Around that same time, defendants also issued change orders which provided that ISPN would be compensated for performing additional work not specified in the contract, such as applying an epoxy coating to the wash bay floor. (Plaintiff's Exhibit Q.)

{¶107} The evidence fails to establish that the delay in project completion is attributable to Applied as to entitle DAS and ODOT to liquidated damages. Applied declined ASA and defendants' request to remedy the wash bay floor no later than about May 1, 2007. Although the remedial work entailed the relatively minor task of smoothing and sloping certain areas of the wash bay floor and then applying an epoxy coating over the floor, approximately five months passed before defendants had another contractor perform the same, and Burnie acknowledged that ODOT had already begun using the wash bay by that time. The evidence presented does not explain the reason for the delay, nor does it establish when Applied was terminated from the project, when Applied's bonding company was contacted, or when and how ISPN came to be hired.

{¶108} Based upon this evidence, the court finds that DAS and ODOT have failed to prove by a preponderance of the evidence that any portion of the delay was attributable solely to Applied. See *Lee Turzillo Contracting Co. v. Messer & Sons, Inc.* (1969), 23 Ohio App.2d 179, 184 ("* * * where an owner and a contractor are each responsible for a certain amount of unreasonable delay in completing the work, the owner is barred from assessing the contractor with liquidated damages for whatever delay might have occurred in the completion of the work.") Accordingly, the court finds that DAS and ODOT have failed to prove by a preponderance of the evidence that they are entitled to liquidated damages.

{¶109} For the foregoing reasons, the court renders judgment in favor of defendants as to plaintiff's claims for relief and in favor of plaintiff as to DAS and ODOT's counterclaim.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

APPLIED CONTRACTING CORP.

    Plaintiff/Counter Defendant

    v.

OHIO DEPARTMENT OF TRANSPORTATION, et al.

    Defendants/Counter Plaintiffs

    and

STATE OF OHIO

    Defendant
Case No. 2008-07195

Judge Joseph T. Clark

<u>JUDGMENT ENTRY</u>


{¶110}    This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, the court enters judgment in favor of defendants as to plaintiff's complaint and in favor of plaintiff as to DAS and ODOT's counterclaim. Court costs are to be shared equally by the parties. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.


                                JOSEPH T. CLARK
                                Judge

cc:

Bryan R. Perkins
6470 A Glenway Avenue, #178
Cincinnati, Ohio 45211

Kristin S. Boggs
Mark R. Wilson
Paula Luna Paoletti
William C. Becker
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

RCV/dms
Filed August 22, 2011
To S.C. reporter October 13, 2011